1 Jon M. Sands
Federal Public Defender
2 District of Arizona
3 Alison Y. Rose (CA Bar No. 268937)
Amanda C. Bass (AL Bar No. 1008-H16R)
4 Eric Zuckerman (PA Bar No. 307979)
5 Jennifer M. Moreno (CA Bar No. 244967)
Assistant Federal Public Defenders
6 850 West Adams Street, Suite 201
7 Phoenix, Arizona 85007
8 alison_rose@fd.org
amanda_bass@fd.org
9 eric_zuckerman@fd.org
jennifer_moreno@fd.org
10 602.382.2734 Telephone
11 602.382.2800 Facsimile

12 *Counsel for Plaintiff*

13

**IN THE UNITED STATES DISTRICT COURT**
14 **FOR THE DISTRICT OF ARIZONA**

15

16 | Clarence Wayne Dixon, | **CV-22-604-PHX-MTL (JFM)** |

                     Plaintiff,
17
      vs.
18

19 The Arizona Department of Corrections, | COMPLAINT FOR EQUITABLE,
Rehabilitation & Reentry (ADCRR); David | INJUNCTIVE, AND DECLARATORY
20 Shinn, Director of the Arizona Department | RELIEF [42 U.S.C. § 1983]
21 of Corrections, Rehabilitation & Reentry;
James Kimble, Warden, ASPC – Eyman;
22 Travis Scott, Deputy Warden, ASPC –
23 Browning Unit; and John Does, Unknown
ADCRR Personnel, in their official
24 capacities as Employees, Contractors,
25 and/or Agents of the Arizona Department of
Corrections, Rehabilitation & Reentry,
26
                      Defendants.
27

28

**Introduction**

1.      Plaintiff Clarence Wayne Dixon is a 66-year-old visually disabled, physically frail, and severely mentally ill prisoner subject to a sentence of death imposed by the Maricopa County Superior Court. Plaintiff is a United States and Arizona citizen, resident of the State of Arizona, and member of the sovereign Navajo Nation. He is scheduled to be executed by the State of Arizona on May 11, 2022.

2.      Upon issuance of the warrant for Plaintiff's execution on April 5, 2022, he was transported from his close custody cell at Central Unit to a Death Watch cell at Browning Unit. Plaintiff has been housed on Death Watch for the last seven days and, pursuant to the Arizona Department of Corrections, Rehabilitation & Reentry's ("ADCRR") execution protocol, will remain there for the next twenty-nine days until he is executed. *See* Ariz. Dep't of Corr., Rehab. & Reentry, *Dep't Order 710—Execution Procedures* at 11–18           (Mar.                     10,                     2021), https://corrections.az.gov/sites/default/files/policies/700/0710_031021.pdf ("DO 710").

3.      Upon information and belief, Plaintiff's Death Watch cell consists of three concrete walls and a fourth wall consisting of plexiglass. A corrections officer is stationed directly outside of his cell and, upon information and belief, writes down Plaintiff's movement in a log every fifteen minutes. A camera is located in Plaintiff's cell that records all of his movements. Plaintiff has the following items with him in his solitary cell: personal and legal paperwork; a digital talking book; audio books; a tape recorder; a talking clock; an ocular eye piece; a folding cane; UV sunglasses; a digital wristwatch; a tablet; Sony tape player; used cassette tapes; clothing items; shower shoes; 2 sheets; 2 blankets; 1 pillow case; 1 towel; 1 washcloth; 1 writing board; and a baggie containing a plastic spoon, instant drink mixes, and salt and pepper. Plaintiff must ask the corrections officer seated outside of his cell for toilet paper each time he needs to use the toilet. Upon information and belief, Plaintiff is the only prisoner housed on Death Watch and, apart from limited contacts with ADCRR staff and daily legal visits, he has spent the last eight days in near total isolation.

1

**Nature of Action**

2    4.        This action is brought pursuant to 42 U.S.C. § 1983 for violations by the Arizona

3    Department of Corrections, Rehabilitation and Reentry ("ADCRR") and its personnel of

4    Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, his

5    Fourteenth Amendment right to due process, and his rights under Title II of the Americans

6    with Disabilities Act, 42 U.S.C. § 12131, et seq. ("the ADA") and Section 504 of the

7    Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"), and their respective implementing

8    regulations.

9    5.        Plaintiff seeks equitable, injunctive, and declaratory relief to prevent Defendants

10   from continuing to subject him to conditions of confinement prior to his execution that

11   violate the Constitution, the ADA, and Section 504.

12   6.        This Complaint does not challenge Plaintiff's underlying capital conviction or

13   sentence of death, nor does it allege that his execution is per se unconstitutional.

14

**Jurisdiction and Venue**

15   7.        This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28

16   U.S.C. § 1343 (civil rights violations), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C.

17   § 2202 (injunctive relief). Plaintiff invokes this Court's jurisdiction pursuant to Article III

18   of the United States Constitution, the Eighth and Fourteenth Amendments to the United

19   States Constitution, 42 U.S.C. § 1983, the ADA, and Section 504.

20   8.        Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). Plaintiff is

21   currently incarcerated at the Arizona State Prison Complex ("ASPC")—Browning Unit,

22   1305 E. Butte Avenue, Florence, Arizona, 85132, located in this District. Each Defendant

23   resides in this District and all of the events giving rise to Plaintiff's claims have occurred

24   and/or will occur in this District.

25

**The Parties**

26   9.        Plaintiff Clarence Wayne Dixon is a United States and Arizona citizen, and

27   member of the sovereign Navajo Nation. Plaintiff is incarcerated at ASPC—Browning

28   Unit in Florence, Arizona.

1    10.    Plaintiff is under a warrant of execution and is scheduled to be executed on May
2    11, 2022. On January 5, 2022, the State of Arizona moved the Arizona Supreme Court to
3    set a briefing schedule on its anticipated motion for a warrant of execution for Plaintiff.
4    *See* Motion to Set Briefing Schedule for Motion for Warrant of Execution, *State of*
5    *Arizona v. Clarence Wayne Dixon*, No. CR–08–0025–AP (Ariz. Jan. 5, 2022). On
6    February 9, 2022, the Arizona Supreme Court granted the State's motion and set a briefing
7    schedule on the warrant for Plaintiff's execution that concluded on March 31, 2022. Order,
8    *State of Arizona v. Clarence Wayne Dixon*, No. CR–08–0025–AP (Ariz. Feb. 9, 2022).
9    The Arizona Supreme Court conferenced the State's motion on April 5, 2022. *Id.* A
10   warrant of execution issued that same day, and Plaintiff's execution will occur on May
11   11, 2022. *See* Ariz. R. Crim. P. 31.23(c) (requiring a warrant of execution to "specify an
12   execution date that is 35 days after the warrant's issuance").

13   11.    Defendant David Shinn is the Director of ADCRR and is being sued in his official
14   capacity for equitable, injunctive, and declaratory relief.

15   12.    Defendant Travis Scott is the Warden of ASPC—Browning Unit where Plaintiff is
16   is being subjected to Department Order 710's Death Watch protocol and is being sued in
17   his official capacity for equitable, injunctive, and declaratory relief.

18   13.    Defendant James Kimble is the Warden of ASPC—Florence where Plaintiff was
19   subjected to Department Order 710's Death Watch Protocol between April 5, 2022 and
20   April 6, 2022, and is being sued in his official capacity for equitable, injunctive, and
21   declaratory relief.

22   14.    Defendants John Does, Unknown ADCRR Personnel, are staff or agents of
23   ADCRR or the State of Arizona who are ADCRR's officers, successors in office, agents,
24   contractors, and employees, along with those acting in concert with them, who have
25   participated or will participate in Plaintiff's incarceration on Death Watch for thirty-five
26   days prior to his execution involving, *inter alia*, transferring Plaintiff to the Death Watch
27   cell, placing him under 24-hour continuous observation, and depriving him of a blind aide
28   which he requires to carry out the basic activities of daily living due to his visual disability.

1   Plaintiff is not aware of the true identities of John Does, but alleges that when Plaintiff
2   discovers their identities, Plaintiff will amend this Complaint accordingly.

3   15.     Defendant ADCRR is a public entity within the meaning of and subject to Title II
4   of the ADA. *See* 42 U.S.C. § 12131(1). ADCRR is duly organized and exists under the
5   laws of the State of Arizona, and a government entity. ADCRR is responsible for, and
6   retains authority over, the operation and management of Arizona's correctional facilities,
7   including ASPC – Browning Unit, and is subject to the ADA Regulations at 28 C.F.R. §
8   35.152, *et seq*.

9   16.     ADCRR receives state and federal funds for the operation of its prisons and has
10  received such funds throughout the time period during which the acts described herein
11  have continued. ADCRR is legally responsible for ADA violations committed by ADCRR
12  staff and contractors who provide programs, services, or activities, including, but not
13  limited to, transferring prisoners to Death Watch and overseeing and operating Death
14  Watch. *See* 28 C.F.R. § 35.130(b)(1).

15  17.     Defendants are also departments, agencies, or instrumentalities of the State of
16  Arizona or representatives of the same and are "public entit[ies]" within the meaning of
17  42 U.S.C. § 12131(1)(B).

18                                  **Relevant Facts**
19  **A.    Plaintiff is Legally Blind**
20  18.     In 2000, Plaintiff was diagnosed with Glaucoma. (Ex. 1.) His vision has steadily
21  deteriorated since his diagnosis, and he was declared legally blind in 2015. (Ex. 2.)
22  Plaintiff is legally blind in both eyes and substantially limited in major life activities such
23  as reading and writing.

24  19.     Plaintiff is a qualified individual with disabilities within the meaning of the ADA,
25  42 U.S.C. §§ 12102, 12131, 28 C.F.R. § 35.104. Plaintiff has physical impairments in that
26  he is legally blind. Plaintiff also suffers from brain abnormalities and a serious mental
27  illness, including paranoid schizophrenia, a psychotic disorder, and prior findings of legal
28  insanity.

20.     As a result of Plaintiff's blindness, ADCRR has designated him as having "Medical ADA Restrictions/Special Needs." (Ex. 3.) Plaintiff has been able to engage in certain activities of daily living despite his visual disability only as the result of accommodations provided to him by ADCRR.

21.     Those accommodations include the assistance of a blind attendant and use of several physical auxiliary aids. Plaintiff's blind aide[1] has historically helped him to navigate his surroundings by escorting him to and from medical appointments and visitation; complete prison-related forms and other paperwork, including health needs requests; locate items in his cell; identify what and who are in his immediate surroundings; and read and transcribe correspondence, including letters, emails, and legal mail. (See, e.g., Ex. 4 (noting the form was "written out by blind aid Nelson, B.").) ADCRR has also provided Plaintiff with: a folding cane (for navigation, orientation, and mobility); a cassette tape recorder (to record legal correspondence to his team); a Sony tape player (to listen to legal correspondence recorded by his team); a 50x magnifying ocular eye piece; a digital talking book, through the Arizona Talking Book Library (to listen to audiobooks and news); a talking clock and digital wristwatch (with alarm settings to help Plaintiff keep track of time); a tablet (which includes a feature that tells Plaintiff the time); and UV sunglasses.

22.     Plaintiff's legal blindness qualifies him as a disabled person under the ADA and Section 504. (See Ex. 2.)

**B.      Plaintiff Has an Extensive History of Severe Mental Illness, Incompetency, and Legal Insanity**

23.     In addition to being visually disabled, Plaintiff is seriously mentally ill ("SMI") and is diagnosed with paranoid schizophrenia. (Ex. 5 at 3 (stating Plaintiff "present[ed] symptoms of undifferentiated schizophrenia").)

---

[1] Death row prisoner Scott Lehr was Plaintiff's blind aide from August 2, 2017 until February 16, 2021. Between February 16, 2021 and April 21, 2021, death row prisoner Robert Walden served as Plaintiff's blind aide. On information and belief, Mr. Walden was removed as Plaintiff's aide in April 2021 and put on report in retaliation for informing Plaintiff's counsel that Plaintiff was being denied access to legal cassette correspondence which Plaintiff uses to communicate with counsel due to his visual disability.

24.     Plaintiff has a long and well-documented history of SMI, including prior findings of incompetency, a legal finding of not guilty by reason of insanity ("NGRI"), and multiple diagnoses of paranoid schizophrenia. (Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9.)

25.     In 1977, Plaintiff was arrested for an assault that involved bizarre behavior both during and after the offense. Former U.S. Supreme Court Justice Sandra Day O'Connor—then sitting as an Arizona trial judge—referred him for Rule 11 competency proceedings. As a result, Plaintiff was found incompetent by two separate evaluators. In September 1977, a court-appointed psychiatrist determined that "he cannot make competent decisions regarding the waiver of [his legal] rights" and that his understanding of the consequences of entering a plea of guilty "is not rational." (Ex. 6 at 1 ¶ 2.) That same month, another court-appointed psychiatrist found that Plaintiff "cannot assist counsel in the preparation of his defense. At this time he presents symptoms of undifferentiated schizophrenia, in partial remission." (Ex. 5 at 3.)

26.     In the aftermath of these incompetency findings, Plaintiff was committed to the Arizona State Hospital ("ASH"). He was released from ASH approximately two months later, after a third psychiatrist found he had regained competency to stand trial. (Ex. 10.)

27.     On January 5, 1978, Plaintiff was found Not Guilty By Reason of Insanity ("NGRI") and released, pending civil commitment proceedings, which Judge O'Connor ordered the State to commence within 10 days. (Ex. 7.) The murder for which Plaintiff is scheduled to be executed occurred less than two days after the NGRI finding and civil commitment proceedings were ordered. At the time of the murder, Plaintiff was a student at Arizona State University who, on January 12, 1978, withdrew from classes due to his declining mental health (Ex. 11.)

28.     More than two decades later, in November 2002, Plaintiff was indicted for the January 7, 1978 murder and sexual assault of Deana Bowdoin based on the discovery of inculpatory DNA evidence. (Ex. 12.) At the time of his indictment, Plaintiff was serving seven life sentences for his 1985 convictions arising out of another sexual assault. In 1995, during Plaintiff's incarceration for the 1985 convictions, Department of Corrections staff

collected the DNA sample from Plaintiff that ultimately linked him to Bowdoin's murder.

29.     During his capital trial, Plaintiff fired his attorneys due to their refusal to raise an issue over which he perseverated that had no basis in fact or law. He was allowed to represent himself despite evidence of ongoing incompetency known to his attorneys, and despite the prior findings of incompetency and legal insanity. Plaintiff's delusional rationale for firing his counsel was based on his irrational belief that the DNA sample taken from him in 1995, while he was incarcerated for sexually assaulting a Northern Arizona University ("NAU") student ten years earlier, was inadmissible in his capital case because the NAU police were not a legal entity when they arrested him in 1985. (Ex. 13.) This claim ("the NAU issue"), however, lacked *any* basis in fact, principally because the collection of the DNA sample by Department of Corrections staff in 1995 had no connection to Plaintiff's arrest for the 1985 offenses, and because it was the Flagstaff City Police, not the NAU police, that arrested Plaintiff in 1985.

30.     After firing capital trial counsel so that he could raise the meritless NAU issue, Plaintiff immediately filed a Motion to Suppress the DNA Evidence based on the NAU issue and, when the trial court denied his motion, he filed a special action in the Arizona Supreme Court, which was also denied. While ineffectively representing himself, Plaintiff was convicted and sentenced to death.

31.     For almost 30 years, Plaintiff has prepared and submitted numerous pro se filings in state and federal courts arguing the NAU police lacked authority to investigate and arrest him in 1985. In February 1993, he filed his first pro se filing, a petition for writ of habeas corpus, in the Arizona Supreme Court alleging the NAU police had no authority to gather evidence. The court denied his petition and subsequent petition for review. Five months later, in February 1994, he filed a petition for writ of habeas corpus in Pinal County Superior Court claiming he was illegally confined because the NAU officers lacked authority to enforce Arizona laws. The court transferred his case to Coconino County. He then filed a petition for special action in Pinal County, which was dismissed in July 1994. Six weeks later, in August 1994, he filed a notice of postconviction relief in

1   Coconino County and then filed his petition about two months later. On April 14, 1995,

2   his petition was denied. His subsequent petitions for review were denied. In October 2001,

3   he filed a petition for postconviction relief in Coconino County, which was denied four

4   months later in February 2002. He filed two petitions for review in 2002 and 2003 that

5   were denied. During the pendency of his capital trial and appeals, he continued to raise

6   this issue with counsel and continues to raise this issue. In 2021, he filed pro se petitions

7   for habeas corpus in the Arizona Supreme Court and a petition for a writ of certiorari in

8   the United States Supreme Court. His certiorari petition was denied.

9   32.     During state postconviction proceedings, Plaintiff was evaluated by John Toma,

10   Ph.D., and Lauro Amezcua-Patino, M.D.  Dr. Toma found that he suffered from "mood,

11   thought and perceptual disturbances" and that there were "significant cognitive [brain]

12   impairments noted from his neuropsychological test scores." (Ex. 8 at 21, 22.) Further, the

13   neuropsychological tests indicated possible brain damage meeting the diagnostic criteria

14   for Cognitive Disorder, Not Otherwise Specified ("NOS"). (Ex. 8 at 18, 22–23, 24.)

15   Plaintiff also underwent neuroimaging that evidenced brain abnormalities. (Ex. 14 at 4.)

16   33.     In addition to the findings of brain impairment, Dr. Toma found evidence of

17   Plaintiff's mental illness, including severe depression, paranoia, and perceptual

18   disturbances, and diagnosed him with a psychotic disorder, schizophrenia. (Ex. 8 at 21-

19   22, 24.) Dr. Toma also administered the Minnesota Multiphasic Personality Inventory-2

20   ("MMPI-2"), which  corroborated a finding that Plaintiff suffers from "[a] psychotic

21   disorder (such as Schizophrenia)[.]" (Ex. 8 at 20.) Dr. Toma found that Plaintiff met the

22   DSM-IV-TR diagnostic criteria for Paranoid Schizophrenia. (Ex. 8 at 24.)

23   34.     Dr. Amezcua-Patino concluded that Plaintiff "suffers from chronic and severe

24   psychiatrically determinable thought, cognition and mood impairments that are expected

25   to continue for an indefinite period of time of a Schizophrenic nature[.]" (Ex. 9 at 4.)

26   35.     Plaintiff's current mental state is consistent with his history of psychotic delusions,

27   schizophrenia, legal insanity, and incompetency. He was recently reevaluated by Dr.

28   Amezcua-Patino, who concluded that Plaintiff is incompetent to be executed because his

1  "capacity to understand the rationality of his execution is contaminated by the

2  schizophrenic process which results in his deluded thinking about the law, the judicial

3  system, his own lawyers, and his ultimate execution[.]" (Ex. 15 at 13.)

4  36.    Dr. Amezcua-Patino also concluded that Plaintiff's mental illness puts him at

5  heightened risk of suffering physical and psychiatric harm on Death Watch:

6

7          It is a well-known fact that extreme isolation of any individual leads to severe
           psychological and psychiatric distress; vulnerable individuals such as those

8          with mental disorders are particularly more susceptible to decompensations.

9          In Clarence's case, the psychosocial and physical stress related to increased
           isolation, lack of any privacy, and 24-hour supervision is likely to worsen his

10         delusional and paranoid thinking, initiate a new depressive episode, and

11         worsen his anxiety. In the context of his blindness, deathwatch becomes a
           new challenge with new uncertainties that will challenge all of his acquired

12         abilities to manage his blindness.

13
           Under his circumstances, deathwatch isolation is analogous to psychological

14         torture that is highly likely to lead to psychiatric decompensation.

15  (Ex. 15 at 13.)

16                          **Exhaustion of Administrative Remedies**

17  37.    Plaintiff has exhausted all the remedies available to him in an effort to resolve these

18  issues. Disability accommodations are not contemplated by or provided for in ADCRR's

19  Department Order 710. Plaintiff has grieved the unlawfulness of Death Watch generally

20  and as applied to him as a disabled prisoner in accordance with ADCRR's grievance

21  procedures.

22  38.    On February 10, 2022, Plaintiff filed an Inmate Informal Complaint wherein he

23  challenged Department Order 710—and Death Watch specifically—as a violation of his

24  federal rights. (Ex. 16.)

25  39.    On February 14, 2022, Plaintiff filed an Inmate Grievance wherein he again

26  challenged Department Order 710 and Death Watch as a violation of his federal rights "as

27  a visually disabled prisoner." (Ex. 17.)

28  40.    On February 23, 2022, following ADCRR's denial of his Inmate Grievance,

Plaintiff filed an Inmate Grievance Appeal wherein he "appeal[ed] the February 17th deci[s]ion denying my grievance by ADW Jensen. 35 days and nights of contemplation of my execution completely heightened by deliberate isolation, punitive removal and confiscation of my personal property including a digit[al] talking book, and radio, and complete removal of any kind of privacy by C.O.s observing 24/7 is a deliberate and focused protocol of mental pain and emotional torture." (Ex. 18.) Plaintiff's grievance appeal stated further that:

> Complete isolation, lose [sic] of property, lose [sic] of any semblance of privacy and 35 days and nights contemplating death's arrival as an unnatural homicide is a violation of the 4th, 6th, 8th, and 14th Amendments of the U.S. Constitution and Arizona's counterpart. For these many important reasons I request the 35 day death watch protocol found in D.O. 710 be eliminated as unconstitutional. I am totally blind and D.O. 710 violate[s] the Americans with [D]isabilities Act and international human rights laws.

(Ex. 18)[2]

41.     In addition to exhausting ADCRR's internal grievance procedures, on February 17, 2022, counsel for Plaintiff put ADCRR on notice that:

> Mr. Dixon has a disability as defined by Title II of the ADA and Section 504 of the Rehabilitation Act, and is seriously mentally ill. Mr. Dixon's conditions mean that the Arizona Department of Corrections, Rehabilitation and Reentry's (ADCRR's) execution protocol, which requires Mr. Dixon to be isolated and continuously watched for the thirty-five-day period before his execution, will seriously affect his ability to navigate his environment and maintain mental health.

(Ex. 20 at 1.) Plaintiff's counsel specifically asked what, if any, accommodations would be provided to account for Plaintiff's visual disability during Death Watch and requested that ADCRR "[m]aintain [his] current conditions of confinement until any execution (again, with full support of his personal and physical aids), rather than subjecting him to the harm caused by the facially torturous conditions imposed by the Execution Protocol's isolation requirement. (Ex. 20 at 3–4.)

42.     On February 25, 2022, ADCRR informed Plaintiff's counsel that it would allow

---

[2] Plaintiff's grievance appeal was denied on April 6, 2022. (Ex. 19.)

Plaintiff to have "continued access to and use of the nine physical and auxiliary aids delineated in your letter, . . . (1) folding cane, (2) cassette tape recorder, (3) Sony tape player, (4) 50x magnifying ocular eye piece, (5) talking book, (6) talking clock, (7) digital wristwatch with alarm settings, (8) tablet with dime feature, (9) UV sunglasses." (Ex. 21 at 1.) ADCRR also advised Plaintiff's counsel that he would have "continued access to and use of his current blind aide, fellow Death Row Inmate Brad Nelson (ADCRR #249535). When Inmate Dixon is transferred to the single-person cell on the Browning Unit, Inmate Nelson will be transferred with him and housed in the adjoining cell." (Ex. 21 at 1.)

43.     ADCRR informed Plaintiff's counsel that ADCRR will not accommodate your request that Inmate Dixon be permitted to 'privately use his audio aids to communicate with his legal team without guards observing orally or visually his creation or receipt of legal materials because the safe, secure, and orderly operation of the prison requires continuous visual contact during the 35-day period." (Ex. 21 at 1.) It provided that "in order to preserve the confidentiality of the attorney-client relationship and attorney-client communications, security staff will not be posted so as to enable them to hear what Inmate Dixon and/or Inmate Nelson are saying when they are discussing confidential legal communications with Inmate Dixon's attorneys, but they will remain posted so as to enable them to maintain visual contact with Inmate Dixon at all times, as required by DO 710, § 7.1.6." (Ex. 21 at 2.)

44.     ADCRR stated that it "will not accommodate your final request to depart from the longstanding provisions of DO 710, § 7.1 and § 7.2 and maintain Inmate Dixon's current housing and conditions of confinement[.]" (Ex. 21 at 2.) It represented that while on Death Watch:

> First, Inmate Dixon will be housed next to his blind aide, Inmate Nelson, and may communicate with him at will. Second, Inmate Dixon may communicate with security staff at will. Third, Inmate Dixon may watch TV, as expressly permitted in DO 710, § 7.2.9. Fourth, Inmate Dixon may participate in outdoor exercise and take showers per the current schedule for all other Death

Row inmates in the Browning Unit, as expressly permitted in DO 710, § 7.2.10. Fifth, Inmate Dixon may communicate with his family, friends, clergy, and attorneys, via phone calls and non-contact visits, per the current schedule for all other Death Row inmates in the Browning Unit, as expressly permitted in DO 710, § 7.2.10.

(Ex. 21 at 2.)

45.     ADCRR did not address—nor has it accommodated—Plaintiff's concern that being housed on Death Watch where he will be under constant surveillance for thirty-five days prior to his execution puts him "at a higher risk of suffering as a result of his mental illness, combined with his visual disability. . . . because he is aware that he will be under constant surveillance while in isolation, he will suffer from being unable to know who is watching him, and what type of surveillance the watchers are engaging in." (Ex. 20 at 4.)

46.     Prior to the warrant of executon issuing for Mr. Dixon, Mr. Nelson found that his own placement in a Death Watch setting would be too traumatic and he reported that he would not be able join Mr. Dixon on Death Watch or serve as his blind aide. While ADCRR initially found a replacement blind aide, a prisoner housed on Browning Unit where Death Watch is located, that prisoner too declined to serve as Mr. Dixon's aide. Despite having a significant amount of time to plan for Mr. Dixon to have access to a blind aide on Death Watch,[3] ADCRR moved Mr. Dixon to Death Watch on April 6, 2022.

47.     The day Plaintiff was moved to Death Watch, counsel for Plaintiff contacted ADCRR General Counsel Brad Keogh by phone, and then followed up with written correspondence, in order to attempt to resolve the issue. While ADCRR provided Plaintiff with nine of the auxiliary aids listed in its February 25, 2022 letter to counsel, (*see* Ex. 21), it did not provide Plaintiff with access to a blind aide. Counsel asked that ADCRR fulfill its written agreement (and its ADA obligation) to provide Plaintiff with a blind aide

---

[3] ADCRR has been seeking an execution date for Mr. Dixon since April 6, 2021 when the State filed a Motion to Set Briefing Schedule for Motion for Warrant of Execution with the Arizona Supreme Court. *State of Arizona v. Clarence Wayne Dixon*, No. CR-08-0025-AP (Ariz. Apr. 6, 2021). Given that Mr. Dixon has been legally entitled to a blind aide since 2017, ADCRR has had at least a full year to arrange for Mr. Dixon to have access to a blind aide on Death Watch, consistent with the Department's legal obligations under the ADA and Section 504.

1    on Death Watch. (Ex. 22 at 9.)

2    48.     Counsel also asked that ADCRR provide Plaintiff with several additional items and

3    accommodations, including: (1) daily contact visits with his legal team; (2) medicated eye

4    drops that he requires for glaucoma; (3) COVID-testing; (4) his sweatshirt; (5) his writing

5    board; and (6) blank cassette tapes. (Ex. 22 at 9–10.) Mr. Keogh responded that, in

6    addition to providing Plaintiff with these items, "[a]ccommodations will be made to

7    facilitate a blind aide for eight hours every day, from 8:00 a.m. to 4:00 p.m. However,

8    since [two prisoners] both have now refused to serve as Inmate Dixon's blind aide, as we

9    discussed yesterday evening, this responsibility now falls to your office to designate

10    personnel to perform this task." (Ex. 22 at 7.)

11    49.     Counsel informed Mr. Keogh that not only was it "not feasible for someone in my

12    office to serve as Mr. Dixon's blind aide for 8 hours each day for the next 34 days[,]" but

13    that "as a public entity subject to the ADA and Section 504, the responsibility for

14    providing Mr. Dixon with a blind aide—as it did for several years while Mr. Dixon was

15    housed on Central Unit—lies with ADCRR." (Ex. 22.) Mr. Keogh subsequently offered

16    "Inmate Dixon's assigned COIII to provide reading assistance on as as-needed basis when

17    requested by Inmate Dixon" and inquired about whether, in light of this, "you are waiving

18    the attorney-client privilege and attorney work product privilege on behalf of Inmate

19    Dixon, or whether you are proposing some other mechanism by which ADCRR personnel

20    may provide this assistance given your office's refusal to provide it to your own client."

21    (Ex. 22.)

22    50.     Counsel proposed that, if ADCRR were to designate Plaintiff's assigned COIII to

23    assist Plaintiff as a blind aide, "we would ask that ADCRR enter into a written agreement

24    with my office that the COIII's work with Mr. Dixon in this capacity will remain

25    privileged, confidential, not subject to disclosure, and that Mr. Dixon is not waiving either

26    work-product or attorney-client privileges by receiving blind aide assistance from his

27    COIII." (Ex. 22.) Counsel asked Mr. Keogh to "please send us a draft agreement for our

28    review." (Ex. 22.)

51.     Instead, Mr. Keogh advised counsel that "[i]t is neither legally nor factually tenable for an ADCRR employee to be the legal and factual agent of the Federal Public Defender's Office in order to preserve the attorney-client privilege and attorney work product privilege. It is for that reason that I inquired whether you were waiving those privileges given your office's refusal to provide this assistance to your own client." (Ex. 22.)

52.     In other words, while ADCRR again has repeatedly acknowledged that Plaintiff is entitled to a blind aide accommodation as a visually disabled person, and although it previously assured Plaintiff that a blind aide would in fact be provided once moved to Death Watch, ADCRR has shifted its own legal responsibility for providing this accommodation onto Plaintiff and his counsel.

## General Allegations

### A.     Plaintiff Is Being Subjected to Death Watch Conditions

53.     "Death Watch" refers to changes in Plaintiff's conditions of confinement implemented by Defendants pursuant to Department Order 710 after a death warrant issues. DO 710 (7.0 et seq.). These changes include relocation to a new cell, increased or around-the-clock observation, and limited access to personal property. (*Id.*)

54.     Death Watch is commenced by the warden reading to the condemned prisoner his execution warrant. DO 710.07(1.1). It begins thirty-five days before the scheduled execution. DO 710 § 7.1.2.

55.     After the Arizona Supreme Court granted the State's motion for warrant of execution on April 5, 2022, Plaintiff's Central Unit cell was emptied and he remained there overnight with a guard stationed outside until he was transported to the Death Watch Cell at Browning Unit at approximately 7:30 a.m. on April 6, 2022. During this time, Plaintiff did not have access to the medicated eyedrops or the oral medicaton prescribed for his glaucoma. At approximately 7:30 a.m. on April 6, 2022, Plaintiff was taken from his Central Unit Cell, strip searched, taken to a receiving area, and put in a van that transported him to Browning Unit. Defendant Scott read the execution warrant to Plaintiff. Plaintiff was then strip searched, x-rayed, "screened on the [Body Orifice Security

1    Scanner] chair," issued new clothes and shoes, and then put in a small room by himself
2    with his property and legal boxes where he felt through the materials he wished to take
3    with him to an entirely new single-person Death Watch cell. DO 710 §§ 7.1.5.1–7.1.5.2.

4    56.    For thirty-five days from April 5, 2022, Plaintiff will be under 24-hour continuous
5    observation by corrections officers and cameras. DO 710 § 7.1.6. Correctional staff write
6    down Plaintiff's "activities and behavior until the sentence of death is imposed" in an
7    observation record. DO 710 § 7.1.7.

8    57.    Plaintiff is not allowed to possess personal property other than select clothing
9    items, several approved auxiliary aids permitted due to his visual disability, and "one box
10   each of legal and religious materials, a pencil and paper, and a book or periodical" without
11   approval from prison administrators. DO 710 §§ 7.2.1, 7.2.4.

12   58.    On information and belief, Plaintiff will be allowed to maintain the same shower,
13   outdoor exercise, and phone schedule as other Death Row inmates in Browning Unit. DO
14   710 § 7.2.10.

15   **B.    A Former Prisoner's Account Details the Harsh, Dehumanizing Conditions
16         on Death Watch**

17   59.    In his Death Watch Diary, Arizona prisoner Robert Towery described the
18   experience of being on Death Watch pursuant to ADCRR's protocol before his execution
19   in 2012. *See generally* Robert Charles Towery, *Death Watch Diary: The Last Days of a*
20   *Death Row Prisoner* (2012). Mr. Towery describes the feeling of being on Death Watch
21   as "complete helplessness and hopelessness . . . every time you want to blow your nose,
22   or go to the bathroom you have to ask for toilet paper. Everything is like that, so you have
23   to ask for everything, when these things are basic needs and functions. *Id.* at 8.

24   60.    Death Watch is characterized by: 1) significant noise in the area around a
25   condemned prisoner's cell; 2) the constant influx of prison employees in and out of the
26   area near the Death Watch cell; 3) the persistence required for the condemned prisoner to
27   receive requested personal items; 4) the discomfort of continuous observation; and 5)
28   constant reminders of the condemned prisoner's impending execution.

1       **i.      Death Watch is Marked by Significant Noise at All Hours**

2    61.     According to Mr. Towery, the Death Watch cell and surrounding area was loud for

3  the duration of the thirty-five days he was on Death Watch, resulting in impaired sleep.

4  *Id.* at 5, 8, 11–12, 16–18, 21–22, 24, 31, 34, 37. He described the talking between

5  corrections officers, radio transmissions, and other sounds as "a never-ending noise that

6  can't be escaped." *Id.* at 9. He recounted that at times, there were nine guards sitting at the

7  folding table outside of his cell. *Id.* at 12. His sleep was interrupted by medical checks

8  from nurses or mental health professionals. *Id.* at 26.

9       **ii.     Unfamiliar Personnel Continuously Come and Go Immediately**
10             **Outside the Death Watch Cell**

11  62.     Mr. Towery recounted a high number of prison personnel in the area. *Id.* at 5, 7, 8–

12  9, 20, 22. Those individuals included the prison warden, deputy warden, assistant deputy

13  warden, tower officers, floor officers, lieutenants, sergeants, nurses, and psychiatrists. *Id.*

14       **iii.    Requesting Personal Items Requires Persistence**

15  63.     Personal items are not permitted in the Death Watch cell without permission from

16  the Assistant Director for Prison Operations. (Dep't Order 710 § 7.2.3) For Mr. Towery,

17  this resulted in delays receiving those items. *Id.* at 4–6. Upon arrival to Death Watch, the

18  condemned prisoner is given "a pencil . . . one book, TV guide, Bible, legal materials,

19  writing materials and new clothing and bedding (two towels, one washcloth, two sheets,

20  pillow case, two blankets, pillow, mattress, boxers, t-shirt, socks and a jump suit. [sic] [ .

21  . . ] and a new pair of flip flops and orange deck shoes." *Id.* at 5. He was initially not

22  permitted to keep his wristwatch. *Id.* at 4.

23  64.     Mr. Towery requested his personal headphones, photos, a radio, a heating pad,

24  glasses, hygiene items, and his personal food items. *Id.* at 4–5. He received his heating

25  pad, watch, a back wedge, photo album, a second Bible, and a pair of prescription glasses

26  three days after being brought to Death Watch. *Id.* at 9. He received his personal food

27  items ten days after being brought to Death Watch. *Id.* at 18. Other personal hygiene items,

28  like Mr. Towery's brush and conditioner, took nearly the entirety of his time on Death

Watch to be approved. *Id.* at 32.

### iv.     The Discomfort of Continuous Observation

65.     In addition to the officers and cameras continuously observing Mr. Towery, he noted that every piece of mail is logged, and officers documented all of his movements, including going to the bathroom. *Id.* at 13. The camera facing the Death Watch cell captured the toilet, both on a live feed and recording. *Id.* at 32.

66.     The discomfort of being observed while going to the bathroom resulted in Mr. Towery having to ask the medical staff for laxatives due to constipation. *Id.* at 32. He stated, "[w]hen [continuous observation] causes physiological changes and physical discomfort to the point of requesting medication, I think it crosses over to being abusive or torturous . . . ." *Id.* at 32.

67.     Even legal calls were sometimes conducted without privacy. *Id.* at 8. Although officers allowed Mr. Towery to choose whether to have his legal calls in his cell or in the "dry"[4] cell, he said that "either way there is a correctional officer within ten feet." *Id.* at 12. Going to the dry cell, taking calls, showering, and receiving non-contact visits all required that Mr. Towery be shackled and strip-searched, disincentivizing him from choosing to partake in those activities. *Id.* at 12–13. Additionally, Mr. Towery described having female corrections officers present while he was strip searched or went to the restroom as "just one more humiliation." *Id.* at 6.

68.     Being continuously watched for thirty-five days is psychologically torturous.

### v.      Death Watch Institutionalizes Persistent Reminders of Plaintiff's Impending Execution

69.     Mr. Towery explained that throughout the thirty-five days of Death Watch, the condemned prisoner is subjected to ongoing reminders of his impending execution, including by filling out forms determining the disposition of his body after death and allowing him to select his preferred method of execution, and by designating "[i]tems to be destroyed if executed." *See* Towery, *Death Watch Diary* at 10, 14. In Mr. Towery's

---

[4] A "dry cell" refers to a cell that is not equipped with sources of water, including a sink and toilet.

1   case, while waiting for his delayed personal items to be provided to him, he recounted

2   "I'm beholden to the same man who is taking part in my murder and who is greatly

3   responsible for how miserable my surroundings are right now." *Id.* at 14.

4   70.    Constant reminders of impending death are psychologically torturous.

5         **vi.    Death Watch Inflicts Extreme Physical and Psychological Pain Upon**

6                  **Plaintiff Over a Prolonged Period Prior to Execution**

7   71.    Solitary confinement is "the degree to which [prisoners] are deprived of normal,

8   direct, meaningful social contact and denied access to positive environmental stipulation

9   and activity." Craig Haney, *The Science of Solitary: Expanding the Harmfulness*

10  *Narrative*, 115 Nw. U. L. Rev. 211, 212 n.1 (2020).

11  72.    Department Order 710's Death Watch protocol subjects Plaintiff to thirty-five days

12  of solitary confinement while he awaits his death.

13  73.    Social science research on the psychological and physiological effects of solitary

14  confinement demonstrates that it can create "gastro-intestinal and genito-urinary

15  problems, diaphoresis [clinical excessive sweating], insomnia, deterioration of eyesight,

16  lethargy, weakness, profound fatigue, feeling cold, heart palpitations, migraine headaches,

17  back and other joint pains, poor appetite, weight loss, diarrhea, tremulousness, [and]

18  aggravation of pre-existing medical problems." *Prisons and Health*, World Health

19  Organization    Regional    Office    for    Europe,    28    (2014)

20  https://intranet.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf.

21  74.    Psychologically, isolation can "range from acute to chronic" and include: anxiety

22  ("ranging from feelings of tension to full-blown panic attacks"); "fear of impending

23  death," depression, including "hopelessness" and "emotional flatness/blunting,"

24  "cognitive disturbances" such as "confused thought processes, disorientation,"

25  "perceptual distortions, ranging from hypersensitivity to hallucinations," such as

26  "distortions in time and space," "depersonalization, detachment from reality,"

27  "hallucinations affecting all five senses," "paranoia and psychosis, ranging from

28  obsessional thoughts to full-blown psychosis," including "psychotic episodes or states:

1    psychotic depression, schizophrenia," and self-harm and suicide. *Id.*

2    75.    Individuals like Plaintiff with underlying mental health conditions are at an

3    increased risk of suffering severe psychological and physiological harm from the

4    conditions mandated by Department Order 710's Death Watch Protocol, including its

5    isolation requirements. (*See* Ex.15 at 13); *see also* American Civil Liberties Union, *Caged*

6    *In: Solitary Confinement's Devastating Harm on Prisoners With Physical Disabilities*, 7

7    (2017)

8    https://www.aclu.org/sites/default/files/field_document/010916-aclu-

9    solitarydisabilityreport-single.pdf (hereinafter cited as "*Caged In*").

10   76.    The physiological and psychological pain that Plaintiff will continue to suffer while

11   on Death Watch is supported by neurobiological research. Naomi I. Eisenberger &

12   Matthew D. Lieberman, *Why Rejection Hurts: A Common Neural Alarm System for*

13   *Physical and Social Pain*, Vol. 8 No. 7 Trends in Cognitive Sci. 294, 298 (2004). Research

14   suggests that "social and physical pain may rely on overlapping neural processes." *Id.*

15   Additionally, "solitary confinement [produces] physiological changes in the brain, harm

16   that is therefore physical, potentially observable, and causes mental pain. Jules Lobel &

17   Huda Akil, *Law & Neuroscience: The Case of Solitary Confinement*, Vol. 147(4)

18   Daedalus, the J. of the Am. Acad. of Arts & Sci. 61, 68 (2018). Further, "studies strongly

19   suggest that solitary confinement can fundamentally alter the structure of the human brain

20   in profound and permanent ways." Brief of Medical and Other Scientific and Health-

21   Related Professionals as *Amici Curiae* in Support of Respondents and Affirmance at 24,

22   *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017) (Nos. 15-1358, 15-1359, 15-1363), 2016 WL

23   7450491, at *24.

24   77.    Because of its deleterious impacts, experts have noted that solitary confinement is

25   frequently used as a form of torture. Stuart Grassian, Psychiatric Effects of Solitary

26   Confinement, Vol. 22 Wash. U. J. L. & Pol'y 325, 373 (2006).

27   78.    By confining Plaintiff pursuant to Department Order 710's Death Watch protocol,

28   Defendants are deliberately subjecting Plaintiff to extreme psychological and

1    physiological pain and suffering.

2          **vii.**    **Plaintiff's Legal Blindness Exacerbates the Physical and Psychological**
3                   **Pain that Death Watch Inflicts Over a Prolonged Period Prior to His Execution**

4    79.     Although all people experiencing solitary confinement are subjected to decreased

5    meaningful and positive contact with others, limited stimuli inside a small cell, and

6    unpredictable loud noises, these sensory extremes are exacerbated for blind individuals.

7    *Caged In* at 4. "[Blind and/or deaf] prisoners often experience a heightened form of

8    sensory deprivation while trapped in the mind-numbing emptiness of solitary

9    confinement. Not only are these prisoners locked in their cells for most or all of the day,

10   they are also frequently denied access to in-cell constructive or recreational activities, such

11   as reading, writing, or watching television, which can be used to help stimulate the mind

12   while in isolation." *Id.* at 5.

13   80.     For blind prisoners like Plaintiff, "the disorienting and jarring sounds [in solitary

14   confinement—ranging from prisoners shouting, to industrial fans, to the loud banging

15   sounds that cell doors make when opening or closing—are constant. Such exposure can

16   result in auditory overload, clogging their only means for obtaining information from their

17   surroundings with senseless cacophony." *Id.* at 35.

18   81.     By confining Plaintiff pursuant to Department Order 710's Death Watch protocol

19   despite their awareness of Plaintiff's visual disability, Defendants are deliberately

20   subjecting Plaintiff to unpredictable stimuli that is physiologically and psychologically

21   harmful.

22   **C.**     **Plaintiff is Being Force to Endure Death Watch Without the Assistance of a**
23         **Blind Aide**

24   82.     Mr. Dixon has been assigned a blind aide since 2017 as part of the ADA

25   accommodations provided to him by ADCRR. Only with the assistance of his blind aide

26   has Mr. Dixon been able to engage in certain activities of daily living and activities

27   essential to his legal case. His blind aide helps him navigate his surroundings by escorting

28   him to and from appointments and visitation; complete prison-related forms and other

1   paperwork, including HNRs; reading and transcribing correspondence, including letters,

2   emails, pro per pleadings, and legal mail; and providing Mr. Dixon with information about

3   his surroundings. Without his blind aide, Mr. Dixon is severely limited in his ability to

4   complete activities of daily living, including reading, writing, orienting himself to his

5   surroundings, and corresponding with others including members of his legal team.

6   83.     ADCRR provided this modification to Mr. Dixon for five years and assured Mr.

7   Dixon it would do so if and when he was moved to Death Watch. Despite the fact that

8   ADCRR acknowledged that Mr. Dixon would be entitled to a blind aide while on Death

9   Watch, and despite giving assurances that one would be provided, it moved him anyway,

10  but has refused to provide access to a blind aide.

11  **D.     Plaintiff Faces a Substantial Risk of Serious Harm on Death Watch**

12  84.     The psychological and physiological harm resulting from Death Watch's solitary

13  confinement requirement is not a risk of harm that society chooses to tolerate. *See*

14  *Americans on Proposals to Reform Solitary Confinement*, School of Pub. Pol'y, U. of

15  Maryland        (June        2021)        https://publicconsultation.org/wp-

16  content/uploads/2021/07/SolitaryReport2021.pdf (opinion poll finding that 86% of those

17  polled favored "reforms in current Congressional legislation that would greatly restrict the

18  use of solitary confinement [for prisoners generally], including 84% of Republicans and

19  90% of Democrats[]").

20  85.     The harms inherent in Department Order 710's Death Watch protocol are

21  substantial and serious for all death-sentenced prisoners, but especially so for blind

22  prisoners like Plaintiff who face an increased risk of psychological and physiological

23  suffering. *See Caged In* at 5.

24  86.     Department Order 710's Death Watch protocol subjects Plaintiff to persistent

25  reminders of his impending execution, simultaneous sensory deprivation and sensory

26  overload (including the fear of unpredictable and unfamiliar noises and voices), the

27  physical danger of navigating unfamiliar surroundings as a blind man, continuous

28  observation by those he cannot see, and he faces an increased risk of paranoia, psychosis,

self-harm, and suicidality.

87. Department Order 710's Death Watch protocol forces Plaintiff to contemplate his execution constantly without reprieve. In his grievance to ADCRR, Plaintiff put Defendants on notice that he will spend "35 days and nights under severe spartan and aggravated conditions of confinement that I will be subject to under D.O. 710 constitutes cruel and unusual punishment and violates my state and federal rights." (Ex. 17.) Completing the necessary execution paperwork, daily health checks, and detention in unfamiliar surroundings are markers by which Plaintiff is forced to continuously contemplate his impending death.

88. Department Order 710's Death Watch protocol provides Plaintiff with limited ways of distracting himself from rumination about his execution. This persistent, forced contemplation of certain impending death is torturous.

89. As someone who is legally blind, Plaintiff will be subjected to the disorienting and jarring sounds and unfamiliar voices that are a result of the death-watch setting. Such exposure may result in auditory overload, thus interfering with one of Plaintiff's primary means for obtaining information from his surroundings.

90. Department Order 710's Death Watch protocol subjects Plaintiff to the heightened danger that he will injure himself in unfamiliar surroundings as a result of his visual impairment, including by tripping or falling.

91. By subjecting Plaintiff to continuous observation, Department Order 710's Death Watch protocol exacerbates Plaintiff's paranoia and schizophrenic symptoms. The compounding effects of knowing he is being continuously observed and filmed, being unable to see the corrections officers who are watching him, and being subjected to unpredictable routines, unfamiliar noises, and a distorted sense of time is analogous to "hooding" torture used to deprive prisoners of war of visual environmental cues.

92. By subjecting Plaintiff to continuous observation, including when using the toilet, Department Order 710's Death Watch protocol places Plaintiff at heightened risk of suffering from humiliating and painful gastro-intestinal discomfort.

93.     By subjecting Plaintiff, who suffers from paranoid schizophrenia, to Department Order 710's Death Watch protocol, Defendants have placed Plaintiff at substantial risk of serious psychiatric harm by exacerbating his underlying mental illness.

94.     Department Order 710's Death Watch protocol subjects Plaintiff to a substantial risk of serious physiological and psychological harm that is inconsistent with evolving standards of decency.

95.     Defendants are aware of the substantial risk of harm that Plaintiff is experiencing and will continue to experience on Death Watch because they are aware of his legal blindness, mental illness, and need for an ADA-mandated blind aide accommodation. Moreover, Plaintiff and his counsel made Defendants aware of the substantial risk of harm that Plaintiff will suffer if moved to Death Watch prior to the warrant for Plaintiff's execution issuing.

96.     Defendants are aware of the physiological harms to prisoners confined on Death Watch pursuant to Department Order 710 as evidenced by the protocol's daily weigh-ins and prison policy of providing medication to alleviate physiological distress to those on Death Watch.

97.     Department Order 710's Death Watch protocol is not narrowly tailored to further a legitimate State interest.

98.     Detaining Plaintiff on Death Watch pursuant to Department Order 710 is not necessary; nor is it narrowly tailored to prevent a risk of self-harm. Indeed, confining Plaintiff on Death Watch pursuant to Department Order 710 *increases* the risk of self-harm as a result of the physical and psychological suffering it inflicts.

99.     Defendants have refused to provide Plaintiff with reasonable abatement of the substantial risk of serious harm that he faces on Death Watch by permitting him to remain in his cell on Central Unit with regular access to his blind aide, Brad Nelson, until a reasonable period prior to his scheduled execution.

100.    Defendants have not reasonably abated the risk of serious harm to Plaintiff on Death Watch by merely providing him with auxiliary aids. Death Watch still subjects

1   Plaintiff to conditions that create a substantial risk of physical and psychological harm

2   resulting from isolation, intermittent noise, unfamiliar surroundings, unfamiliar

3   individuals constantly coming in and out of the area surrounding his cell, constant

4   surveillance, and the inability to know who is watching him.

**Causes of Action**

5

**First Cause of Action**

6   **(42 U.S.C. § 1983; Eighth Amendment; isolation of individuals with severe**
7   **mentalillness; isolation of individuals with physical disabilities)**

8   101.    Plaintiff incorporates and realleges each of the allegations contained in paragraphs

9   1 through 100 of this Complaint as though fully set forth herein.

10          42 U.S.C. § 1983 provides:

11              Every person who, under color of any statute, ordinance, regulation,
12              custom, or usage, of any State or Territory or the District of Columbia,
                subjects, or causes to be subjected, any citizen of the United States or
13              other person within the jurisdiction thereof to the deprivation of any
                rights, privileges, or immunities secured by the Constitution and laws,
14              shall be liable to the party injured in an action at law, suit in equity, or
15              other proper proceeding for redress[.]

16   102.    The Eighth Amendment to the United States Constitution prohibits the federal

17   government from inflicting "cruel and unusual punishments." The Eighth Amendment is

18   applicable to the states, including Arizona, by the due process clause of the Fourteenth

19   Amendment to the United States Constitution.

20   103.    Defendants, their agents, officials, employees, and others acting in concert with

21   them under color of law, by and pursuant to ADCRR's policy, custom, and practice of

22   subjecting prisoners under a sentence of death to Department Order 710's Death Watch

23   protocol, are in violation of the Eighth Amendment to the United States Constitution's

24   prohibition on cruel and unusual punishment.

25   104.    Defendants, their agents, officials, employees, and others acting in concert with

26   them under color of law, by and pursuant to ADCRR's policy, custom, and practice of

27   isolating Plaintiff—who is visually disabled and severely mentally ill—pursuant to

28   Department Order 710's Death Watch protocol, are in violation of Plaintiff's rights under

1  the Eighth Amendment to the United States Constitution to be free from cruel and unusual
2  punishment.

3  105.   Defendants, their agents, officials, employees, and others acting in concert with
4  them under color of law, by and pursuant to ADCRR's policy, custom, and practice of
5  isolating and continuously observing prisoners pursuant to Department Order 710's Death
6  Watch protocol violates the Eighth Amendment to the United States Constitution's
7  prohibition against cruel and unusual punishment.

8  106.   Defendants, their agents, officials, employees, and others acting in concert with
9  them under color of law, by and pursuant to ADCRR's policy, custom, and practice of
10 isolating and continuously observing Plaintiff—who is visually disabled and severely
11 mentally ill—pursuant to Department Order 710's Death Watch protocol, are in violation
12 of Plaintiff's rights under the Eighth Amendment to the United States Constitution to be
13 free from cruel and unusual punishment.

14 107.   Department Order 710's Death Watch protocol is facially unconstitutional under
15 the Eighth and Fourteenth Amendments to the United States Constitution.

16 108.   Department Order 710's Death Watch protocol is unconstitutional as applied to
17 Plaintiff—who is legally blind and suffers from paranoid schizophrenia.

18                      **Second Cause of Action**
19              **(Deliberate Indifference; Eighth Amendment )**

20 109.   Plaintiff incorporates and realleges each of the allegations contained in paragraphs
21 1 through 108 of this Complaint as though fully set forth herein. *See Helling v. McKinney*,
22 509 U.S. 25, 33–35 (1993).

23 110.   "Deliberate indifference" exists where the ADCRR "knows of and disregards an
24 excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. To meet this prong,
25 Plaintiff need not show that ADCRR acted with "the very purpose of causing harm or with
26 knowledge that harm [would] result." *Id.* at 835. "Whether a prison official had the
27 requisite knowledge of a substantial risk is a question of fact subject to demonstration in
28 the usual ways, including inference from circumstantial evidence," *Id.* at 842, and a

1   plaintiff may establish deliberate indifference by showing that the identified risk was

2   "longstanding, pervasive, well-documented, or expressly noted by prison officials in the

3   past." *Id.* at 842–43 (internal quotation marks omitted). Knowledge can be demonstrated

4   by circumstantial evidence, and "a factfinder may conclude that a prison official knew of

5   a substantial risk from the very fact that the risk was obvious." *Id.* at 842. The Eighth

6   Amendment also prohibits deliberate indifference to conditions of confinement that are

7   very likely to cause future serious illness and needless suffering. *Helling*, 509 U.S. at 33.

8   111.   ADCRR is aware of Plaintiff's legal blindness, mental illness, and need for an

9   ADA-mandated blind aide modification; it has provided that modifications for 5 years and

10   promised it would do so if and when Plaintiff was moved to Death Watch. Moreover,

11   Plaintiff and his counsel made ADCRR aware of the substantial risk of harm that Plaintiff

12   will suffer if moved to Death Watch prior to the warrant for Plaintiff's execution issuing.

13   Yet, ADCRR moved him anyway, in conscious disregard of legal duties it had long

14   embraced. For Plaintiff, due to his mental illness and visual disability, the conditions of

15   Death Watch place him at increased risk of psychological and physical suffering compared

16   to prisoners without such disabilities. Detaining Plaintiff on Death Watch is not necessary

17   to carry out his execution. ADCRR's choice to do so, and its failure to accommodate his

18   disability-related needs, despite the knowledge that Death Watch increases the risk of

19   psychological suffering and mental deterioration, is the definition of deliberate

20   indifference.

21                                    **Third Cause of Action**

22   **(Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.)**

23   112.   Plaintiff incorporates and realleges each of the allegations contained in paragraphs

24   1 through 111 of this Complaint as though fully set forth herein.The ADA provides, in

25   relevant part, that "no qualified individual with a disability shall, by reason of such

26   disability, be excluded from participation in or be denied the benefits of the services,

27   programs, or activities of a public entity, or be subjected to discrimination by any such

28   entity." 42 U.S.C. § 12132, et seq.

113.   Public entities may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service" they provide, nor may they afford such individuals "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(i)–(ii). ADA regulations prohibit public entities from providing a qualified individual with a disability "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain a result or benefit and from "limit[ing] a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." *Id.* § 35.130(b)(1)(iii), (vii).

114.   Public entities must "ensure that communications with . . . participants . . . with disabilities are as effective as communications with others." *Id.* § 35.160(a)(1).

115.   Public entities are required to "make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability," unless such modifications "would fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7). They must also "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity[.]" *Id.* § 35.160(b)(1); *see also* 42 U.S.C. §§ 12102(4)(E)(i)(III), 12103(1), 12131(2). "[A]uxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). Auxiliary aids and services include "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments" and the "acquisition or modification of equipment or devices." 42 U.S.C. § 12103(1).

116.   Title IV of the ADA prohibits discrimination against individuals for "oppos[ing] any act or practice made unlawful" by the ADA or for participating in any way in an investigation proceeding under the ADA. 42 U.S.C. § 12203(a). It also makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or

1  enjoyment of, or on account of his or her having exercised or enjoyed, or on account of

2  his or her having aided or encouraged any other individual in the exercise or enjoyment

3  of, any right granted or protected by" the ADA. *Id.* § 12203(b).

4  117.   Plaintiff is a qualified individual with disabilities within the meaning of the ADA,

5  42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104. Plaintiff has physical impairments

6  in that he is legally blind. Plaintiff also suffers from brain abnormalities and serious mental

7  illnesses, including several diagnoses of paranoid schizophrenia, psychotic disorder, and

8  prior findings of legal insanity.

9  118.   ADCRR services, programs, and activities are covered by the ADA. The services,

10  programs, and activities that ADCRR provides to individuals on Death Watch include, but

11  are not limited to, sleeping; eating; showering; toileting; access to legal and religious

12  materials, a pencil and paper, and a book or periodical; communicating with those outside

13  the prison via telephone and non-contact visits; outdoor exercise; television entertainment;

14  safety and security; and medical and mental health services. *See* DO 710 §§ 7.2.4–7.2.10.

15  119.   Defendants are, and at all times relevant hereto were, aware of Plaintiff's blindness

16  and mental illness and have failed to make a reasonable modification to their policies,

17  procedures, and/or practices so as to permit Plaintiff access to his blind aide while on Death

18  Watch for thirty-five days prior to his execution pursuant to Department Order 710.

19  Retaliation by Defendants' employees against prisoners who have historically assisted

20  Plaintiff with ensuring that he is not deprived of his ADA-mandated auxiliary aids

21  constitutes discrimination against Plaintiff because of his blindness.

22  120.   Despite Defendants' knowledge of Plaintiff's visual disability and their prior

23  recognition that he is legally entitled to the use of an ADA-mandated blind aide to

24  facilitate his daily existence, Defendants have failed to provide Plaintiff with that

25  accommodation during the period of time he is on Death Watch.

26  121.   Defendants have failed to meet their affirmative obligations to avoid disability

27  discrimination as a result of their decision to transfer Plaintiff to Death Watch where he

28  does not have access to a blind aide. Defendants have not implemented reasonable

1  modifications or changes to Department Order 710's Death Watch protocol that would

2  mitigate the harm to Plaintiff in the absence of this accommodation. Defendants' failure

3  to do so constitutes discrimination on the basis of Plaintiff's known physical disability

4  and subjects him to physical and psychological harm. Defendants' failure to provide a

5  blind attendant to Plaintiff denies him the benefits of, and discriminates against him with

6  respect to, equal access to, the services, programs, and activities that are accessible to

7  other sighted prisoners on Death Watch.

8  122.    Defendants are deliberately depriving Plaintiff of an accommodation to which he

9  is legally entitled, and which permits him to engage in the activities of daily living.

10  Without the use of his  blind aide, he is unable to fill out prison-related forms and

11  paperwork—including health needs requests ("HNRs") outside of legal visitation hours,

12  or read written correspondence, organize his paperwork, package and mail

13  correspondence, locate items in his cell, or identify who and what are in his immediate

14  surroundings.

15  123.    As a result of Defendants' discriminatory policies and practices, Plaintiff has, and

16  will continue to, suffer physical and psychological pain, severe anxiety, and emotional

17  distress.

18  124.    Plaintiff is entitled to reasonable modifications to Department Order 710's Death

19  Watch protocol, the simplest of which is for Defendants to refrain from detaining Plaintiff

20  on Death Watch. Other accommodations include modifications to the Defendants' pre-

21  execution protocols to permit Plaintiff access to a blind aide while on Death Watch.

22  125.    By failing to make a reasonable modification to Department Order 710's Death

23  Watch protocol to account for Plaintiff's visual disability, Defendants are in violation of

24  the prohibition against disability-based discrimination under the ADA.

25                              **Fourth Cause of Action**

26  **(Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)**

27  126.    Plaintiff incorporates and realleges each of the allegations contained in paragraphs

28  1 through 125 of this Complaint as though fully set forth herein.

127.    Section 504 of the Rehabilitation Act of 1973 provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

128.    Section 504 defines "program or activity," in pertinent part, as "all of the operations of a department, agency, . . . or other instrumentality of a State . . .; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended." *Id.* § 794(b)(1). The requirements of Section 504 apply "to each recipient of Federal financial assistance from the Department of Justice[.]" 28 C.F.R. § 42.502.

129.    Federally funded programs and activities may not "[d]eny a qualified handicapped person the opportunity accorded to others to participate" or "achieve the same benefits that others achieve" from the program or activity. *Id.* § 42.503(b)(1)(i)–(ii).

130.    Recipients of federal funds are required to "insure that communications with their . . . beneficiaries are effectively conveyed to those having impaired vision[.]" *Id.* § 42.503(e).

131.    The "criteria or methods of administration" of a recipient of federal funds may not "purposefully or in effect discriminate on the basis of handicap" or "defeat or substantially impair accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." *Id.* § 42.503(b)(3).

132.    Additionally, "[a] recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory . . . skills where a refusal to make such provision would discriminatorily impair or exclude the . . . persons in a program or activity receiving Federal financial assistance." *Id.* § 42.503(f). Appropriate auxiliary aids include, but are not limited to, "brailled and taped materials, . . . readers, . . . [a]ttendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature[.]" *Id.* § 42.503(f).

133.   A recipient may not "[i]ntimidate or retaliate against any individual, whether handicapped or not, for the purpose of interfering with any right secured by section 504[.]" *Id.* § 42.503(b)(1)(vii).

134.   Plaintiff, who is blind and severely mentally ill, is a qualified individual with a disability within the meaning of Section 504, 29 U.S.C. § 705(20), 42 U.S.C. § 12102.

135.   Defendant ADCRR receives federal financial assistance thereby subjecting itself to the requirements of Section 504. 29 U.S.C. § 794(a). ADCRR employs more than fifteen people. It is legally responsible for Section 504 violations committed by ADCRR staff and contractors who provide programs or activities, including but not limited to transferring prisoners to Death Watch and overseeing and operating Death Watch.

136.   ADCRR's programs and activities are covered by Section 504, 29 U.S.C. § 794(b)(1). The programs and activities that ADCRR provides to prisoners on Death Watch include, but are not limited to, sleeping; eating; showering; toileting; access to legal and religious materials, a pencil and paper, and a book or periodical; communicating with those outside the prison via telephone and non-contact visits; outdoor exercise; television entertainment; safety and security; and medical and mental health services. *See* DO 710 §§ 7.2.4–7.2.10.

137.   Defendants are, and at all times relevant hereto were, aware of Plaintiff's blindness and mental illness and have failed to make a reasonable modification to their policies, procedures, and/or practices so as to permit Plaintiff access to his blind aide while on Death Watch for thirty-five days prior to his execution pursuant to Department Order 710. Retaliation by Defendants' employees against prisoners who have historically assisted Plaintiff with ensuring that he is not deprived of appropriate auxiliary aids also constitutes discrimination against Plaintiff because of his blindness.

138.   Defendants have failed to meet their affirmative obligations to avoid disability discrimination as a result of their decision to transfer Plaintiff to Death Watch where he does not have access to a blind aide. Defendants have not implemented reasonable modifications or changes to Department Order 710's Death Watch protocol that would

1  mitigate the harm to Plaintiff. Defendants' failure to do so constitutes discrimination on
2  the basis of Plaintiff's known physical disability and subjects him to physical and
3  psychological harm. Defendants' failure to provide a blind attendant to Plaintiff denies
4  him the benefits of, and discriminates against him with respect to equal access to, the
5  programs and activities that are accessible to other sighted prisoners on Death Watch.

6  139.   As a result of Defendants' discriminatory policies and practices, Plaintiff has, and
7  will continue to, suffer physical and psychological pain and suffering, severe anxiety, and
8  emotional distress.

9  140.   Plaintiff is entitled to reasonable modifications to Department Order 710's Death
10 Watch protocol, the simplest of which is for Defendants to refrain from detaining Plaintiff
11 on Death Watch. Other accommodations include modifications to the Defendants' pre-
12 execution protocols to permit Plaintiff access to a blind aide while on Death Watch.

13 141.   By failing to make reasonable modifications to Department Order 710's Death
14 Watch protocol to account for Plaintiff's visual disability, Defendants are in violation of
15 the prohibition against disability-based discrimination under Section 504 and its
16 supporting regulations.

17             **Fifth Cause of Action**
18            **(Declaratory and Injunctive Relief)**

19 142.   Plaintiff incorporates and realleges each of the allegations contained in paragraphs
   1 through 141 of this Complaint as though fully set forth herein.

20 143.   By detaining Plaintiff on Death Watch for thirty-five days prior to his scheduled
21 execution, Defendants have subjected Plaintiff to psychological and physiological pain
22 and suffering.

23 144.   By detaining Plaintiff on Death Watch for thirty-five days prior to his scheduled
24 execution without the necessary ADA-mandated blind aide accommodation to which
25 Plaintiff is entitled due to his visual disability, Defendants have discriminated against
26 Plaintiff on account of his disability.

27

28

33

145.     Unless and until enjoined from confining Plaintiff to Death Watch, Defendants will continue to subject Plaintiff to cruel and unusual punishment, and to disability-based discrimination.

146.     Through their past and prospective conduct, Defendants have deprived and will deprive Plaintiff of his Eighth and Fourteenth Amendment rights to freedom from cruel and unusual punishment, and his rights to freedom from disability-based discrimination as guaranteed under the ADA and Section 504.

147.     Both the ADA and Section 504 authorize injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1)-(a)(2); 29 U.S.C. § 794a(a)(2).

148.     Unless and until enjoined from subjecting Plaintiff to Department Order 710's Death Watch protocol, Defendants will continue to violate Plaintiff's Eighth and Fourteenth Amendment rights, as well as his rights under the ADA and Section 504.

**PRAYER FOR RELIEF**

WHEREFORE, having set forth his claims against Defendants, Plaintiff respectfully requests judgment as follows:

1. For a judicial declaration that Department Order 710's Death Watch protocol constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

2. For a judicial declaration that Plaintiff will be subjected to cruel and unusual punishment unless and until Defendants are enjoined from confining him pursuant to Department Order 710's Death Watch protocol.

3. For a judicial declaration that Defendants will violate Plaintiff's rights under the ADA and Section 504 of the Rehabilitation Act of 1973 unless and until Defendants are enjoined from confining him pursuant to Department Order 710's Death Watch protocol.

4. For a preliminary and permanent injunction prohibiting Defendants from subjecting Plaintiff to Department Order 710's Death Watch protocol.

5. For the grant of final judgment in Plaintiff's favor on all claims set forth herein.

6. For the grant of such further relief as the Court deems just and proper.

Respectfully submitted this 13th day of April, 2022.

Jon M. Sands
Federal Public Defender
District of Arizona

Alison Y. Rose
Amanda C. Bass
Eric Zuckerman
Jennifer M. Moreno
Assistant Federal Public Defenders

s/ Alison Y. Rose
Counsel for Petitioner